IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| MidWest*One* Bank, | Civil Action No.: _____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Amanda Anderson, Michael Rosenthal, and Elevate Wealth Management, | |
| Defendants. | |

Plaintiff MidWest*One* Bank ("MidWest*One*"), for its Complaint against Defendants Amanda Anderson, Michael Rosenthal, and Elevate Wealth Management, states and alleges as follows:

## NATURE OF THE ACTION

1. This is an action to recover monetary damages resulting from an ex-employee's efforts to cheat her contractual obligations to her old employer, aided by the tortious conduct of her assistant, her new employer, and its founder. When negotiations to purchase her client block of business from her former employer, Plaintiff MidWest*One*, reached an impasse, Carol Sutterfield[1] designed an end-around with Defendant Michael Rosenthal that enabled Sutterfield to transition her business to Defendant Elevate Wealth Management, violating her customer non-solicitation agreement in the process.

---

[1] Carol Sutterfield is a Defendant in the United States District Court for the Southern District of Iowa, Case No. 3:24-cv-00062-SMR-HCA, for the acts and omissions described herein. Defendants Amanda Anderson, Michael Rosenthal, and Elevate Wealth Management were dismissed from that lawsuit for lack of personal jurisdiction. This lawsuit follows.

Additionally, Sutterfield breached her employee non-solicitation agreement by soliciting Defendant Amanda Anderson to follow her to Elevate Wealth Management. Since joining Elevate Wealth Management, the entirety of Sutterfield's block of business has transitioned to Elevate Wealth Management, which has caused MidWest*One* significant and irreparable harm.

2. For their part, Anderson, Rosenthal, and Elevate Wealth Management were aware of Sutterfield's contractual obligations to MidWest*One* and conspired with her to conceal her breaches of contract by having Rosenthal service Sutterfield's clients.

3. MidWest*One* now asserts claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty against Anderson, and claims of tortious interference with contract and aiding and abetting breach of fiduciary duty against Rosenthal and Elevate Wealth Management.

**PARTIES**

4. Plaintiff MidWest*One* is a domestic bank duly authorized to transact business in Colorado. MidWest*One* maintains its headquarters at 102 South Clinton Street, Iowa City, Iowa 52240. At all times relevant hereto, MidWest*One* has transacted business in this jurisdiction.

5. Defendant Amanda Anderson is a Colorado resident residing at 502 High Point Drive, Longmont, Colorado 80504.

6. Defendant Michael Rosenthal is a Colorado resident residing at 2517 Akron Court, Denver, Colorado 80238.

2

7. Defendant Elevate Wealth Management is a foreign corporation with a principal place of business located at 4100 East Mississippi Avenue, Denver, Colorado 80246.

## JURISDICTION AND VENUE

8. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are domiciled in different states and the amount in controversy is in excess of $75,000.

9. The Court has general personal jurisdiction over Anderson because she is domiciled in Colorado. The Court has specific jurisdiction over Anderson because the acts alleged herein were executed by Anderson while she was in Colorado and Anderson purposefully availed herself of the laws of Colorado.

10. Furthermore, the Court has general personal jurisdiction over Rosenthal and Elevate Wealth Management because they are domiciled in Colorado. The Court also has specific personal jurisdiction over Rosenthal and Elevate because their acts emanated from Colorado when they facilitated Sutterfield's improper solicitation of MidWest*One* customers.

11. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) for the same reasons.

## GENERAL ALLEGATIONS

12. Sutterfield began her employment with MidWest*One* Bank as a financial advisor in April 2018.

13. At the commencement of her employment, Sutterfield signed a Purchase and Sale Agreement that governed the terms of Sutterfield's sale of her block of business to MidWest*One*. (**EXHIBIT A.**)

14. Section 4 of the Purchase and Sale Agreement is captioned "Covenant Not to Compete & Not to Solicit" and provides: "Seller agrees not to render services or sell investments, stocks, mutual funds, bonds or any other securities to any of the Block of Business of Buyer being conveyed to Buyer, except in accordance with the terms herein during the course of regular employment with Buyer."

15. Section 4 further provides that "Each of the above restrictions in this section shall terminate and lapse twelve (12) months after Seller's employment with Buyer terminates, regardless of whether such termination was voluntary."

16. Section 6, Subpart K provides a fee-shifting provision that provides: "In the event either Party is found by a court of competent jurisdiction to be in default under the terms, conditions, and obligations of this Agreement, thereby causing the other Party to seek legal counsel to enforce its rights under this Agreement, the defaulting Party agrees to pay all reasonable attorneys' fees and related expenses of the other Party."

17. Additionally, in 2021, Sutterfield and MidWest*One* entered into a Confidentiality and Non-Solicitation Agreement. (**EXHIBIT B**)

18. The Confidentiality and Non-Solicitation Agreement contains a non-solicitation provision that provides:

> As an essential ingredient of and in consideration of this Agreement and the Company's engagement of Advisor pursuant to the FIS Agreement, Advisor shall not, during the

4

period of Advisor's services to the Company and for a period of twelve (12) months immediately following the termination of Advisor's services to the Company, whether such termination occurs during the term of the FIS Agreement or thereafter (the "Restricted Period"), directly or indirectly do any of the following (all of which are collectively referred to in this Agreement as the "Restrictive Covenant"):

a. Either for Advisor or any Financial Institution: (A) induce or attempt to induce any employee of the Company with whom Advisor had significant contact to leave the employ of the Company; (B) in any way interfere with the relationship between the Company and any employee of the Company with whom Advisor had significant contact; or (C) induce or attempt to induce any customer, supplier, licensee or business relation of the Company with whom Advisor had significant contact to cease doing business with the Company or in any way interfere with the relationship between the Company and its respective customers, suppliers, licensees or business relations with whom Advisor had significant contact; or

b. Either for Advisor or any Financial Institution, solicit the business of any person or entity known to Advisor to be a customer of the Company, where Advisor had significant contact with such person or entity, with respect to products, activities or services that compete in whole or in part with the products, activities or services of the Company.

19. The Confidentiality and Non-Solicitation Agreement also contains a non-disclosure provision, prohibiting Sutterfield from using or disclosing MidWest*One*'s confidential information.

20. The Confidentiality and Non-Solicitation Agreement further requires Sutterfield to return, and not retain any copies of, the company's information, documents and property. The Confidentiality and Non-Solicitation Agreement defines "Confidential or Trade Secret Information" as:

5

including, but not limited to, operating practices and procedures; pricing information; systems information; internal communications of any kind; all customer information; and any other information that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

21. Finally, the Confidentiality and Non-Solicitation Agreement contains an attorney-fee provision, which provides, "[i]n case of any action or proceeding to enforce this Agreement, Advisor agrees to pay the reasonable attorney fees and costs of the Company."

22. While employed with MidWest*One*, Sutterfield was registered with LPL Financial, LLC ("LPL") as a FINRA-licensed broker dealer.

23. LPL is the largest independent broker-dealer in the country, responsible for trading securities invested-in by its customers who are separately engaged in financial services, such as wealth-management advisement.

24. MidWest*One* has partnered with LPL since 2008 to support its wealth-management financial services provided to its customers.

25. Under its agreement with LPL, MidWest*One* employs licensed securities representatives who provide investment-related services and financial advisement to bank clients, subject to LPL's supervision.

26. As one of MidWest*One*'s LPL-licensed broker dealers, Sutterfield provided wealth-management services to MidWest*One* clients, while LPL managed the securities trading for the various investment accounts of MidWest*One* clients.

6

27. As part of her onboarding process at MidWest*One*, Sutterfield entered into an FIS Registered Representative Agreement with LPL and moved all of her securities registrations over to LPL as well.

28. In hiring Sutterfield, MidWest*One* also agreed to hire Anderson, who was serving as Sutterfield's assistant at her prior brokerage firm.

29. While at MidWest*One*, Sutterfield significantly benefited from MidWest*One*'s resources and support, including its relationship with LPL. To this end, her block of business substantially grew to in excess of $21 million during her tenure.

30. Despite her success at MidWest*One*, Sutterfield began preparing to depart from and to compete with MidWest*One* in July 2023 with the help of Anderson.

31. Upon information and belief, Anderson knew that Sutterfield had entered into a Purchase and Sale Agreement with MidWest*One*, knew that Sutterfield had entered into the Confidentiality and Non-Solicitation Agreement with MidWest*One*, and knew that Sutterfield was planning to depart from and compete with MidWest*One*.

32. Anderson was also aware that her involvement, described below, would enable Sutterfield to depart and compete with MidWest*One*, and substantially assisted Sutterfield in violating her contractual obligations owed to MidWest*One*.

33. On July 19, 2023, Anderson and Sutterfield exchanged emails with an attached spreadsheet, entitled "Carol's Client-Summary-6-28-2023." The spreadsheet includes 132 client names, social-security numbers, tax-identification numbers, email addresses, mobile phone numbers, home phone numbers, birthdates, ages, addresses,

7

account types, account values, account registrations, ACH information, beneficiary information, and important client notes.

34. The spreadsheet unquestionably contained Confidential or Trade Secret Information as defined by the Confidentiality and Non-Solicitation Agreement.

35. On September 8, 2023, Anderson sent an email to Sutterfield attaching the "most updated version" of "Carol's Client-Summary-6-28-2023," "Annuity Tracking Spreadsheet 2023," and "Client and Account Summary 10-6-2023 and 10-12 with addresses."

36. Again, the attachments unquestionably contained Confidential or Trade Secret Information as defined by the Confidentiality and Non-Solicitation Agreement.

37. Upon information and belief, Anderson sent Sutterfield these documents with the knowledge that Sutterfield would use this information to compete with MidWest*One*, in violation of her restrictive covenants.

38. Sutterfield deleted the email the day before she notified her boss, John Evans, of her intent to leave MidWest*One*.

39. On September 15, 2023, Anderson again emailed Sutterfield a copy of "Carol's Client Summary 6-28-23," which again contained Confidential or Trade Secret Information as defined by the Confidentiality and Non-Solicitation Agreement.

40. Sutterfield notified Mr. Evans of her intent to leave MidWest*One* in mid-September 2023, and the two began negotiating Sutterfield's purchase of the book of business she serviced during her employment with MidWest*One*.

41. Upon information and belief, Sutterfield was already engaged in discussions about joining Elevate Wealth Management at the time she informed Mr. Evans of her intent to leave MidWest*One*.

42. Upon information and belief, Elevate and/or Rosenthal had knowledge of Sutterfield's restrictive covenants or otherwise knew of facts that should have led them to inquire about the existence of such contracts between Sutterfield and MidWest*One*.

43. Elevate Wealth Management is an independent LPL branch office founded, at least in part, by Rosenthal.

44. Sutterfield could not simply join Elevate Wealth Management and transfer MidWest*One* clients to another LPL branch; instead, pursuant to MidWest*One* and LPL's agreement, MidWest*One* would need to consent to Sutterfield associating with a different LPL branch.

45. As a matter of practice, MidWest*One* does not consent to its financial advisors moving to other LPL branches without reaching an agreement for the financial advisor (or new LPL branch) to purchase the financial advisor's block of business.

46. On September 19, 2023, Mr. Evans wrote to Sutterfield to let her know that her block of business had more than doubled in value since MidWest*One* originally purchased it in 2018. Thus, the block of business was clearly worth more than when it was purchased five years earlier.

47. Sutterfield then forwarded Mr. Evans' email to Rosenthal, making clear that Rosenthal was engaged in the negotiation of Sutterfield's resignation and the purchase of

9

the block of business from the outset. Sutterfield wrote to Rosenthal, "Do you think it's worth getting the attorney involved yet?"

48.  Sutterfield also responded to Mr. Evans, suggesting she could leave MidWest*One* and solicit the clients from the block of business without re-purchasing the block.

49.  Mr. Evans immediately responded on September 19, 2023, stating:

> I don't understand what you are suggesting. Working for a publicly traded company, I can't give away a book of business that the bank paid $125,000 for five years ago. That book of business is now $21 million. When you and I talked back then, the whole idea was to help you grow the business so that we had a significant book to lure a new advisor to replace you when retirement came around or grow Amanda [Anderson] into the role. I'm okay unwinding that idea because it's best for you and the clients. Prior to hearing from LPL, do you have a number in mind?

50.  Mr. Evans' reference to LPL in his September 19 email to Sutterfield related to a service LPL provides in which it will calculate a neutral evaluation of a broker-dealer's block of business to facilitate sale discussions, like the discussions Mr. Evans was having with Sutterfield.

51.  Sutterfield again forwarded Mr. Evans' response to Rosenthal on September 19.

52.  On September 20, 2023, Sutterfield again emailed Mr. Evans with a proposal regarding her departure that did not include a purchase of the book of business. Mr. Evans responded:

> It gets us closer but the big number is you or your partner buying the book of business that the bank purchased five years

10

ago. None of us own our books of business, the bank does. So, we can't take it with the non-solicit agreements and the release to work for LPL. It's a $21 million asset for the bank that generates $200,000+ in revenue. All the rest won't mean much if we don't agree on the big number.

53. Sutterfield again immediately forwarded the email to Rosenthal on September 21, 2023.

54. In each email to Sutterfield leading up to her separation, Mr. Evans made clear that if Sutterfield wanted to continue servicing the clients she worked with while at MidWest*One*, she would need to purchase the book of business, or she would be in breach of her Agreement.

55. Sutterfield forwarded each of these emails to Rosenthal.

56. On September 21, 2023, Rosenthal wrote to Sutterfield with a proposal to present to MidWest*One*:

1. Release date of October 1st, but a block move of the book on November 1st. Roughly $20k in value plus zero expense of you and Amanda [Anderson].
2. Taking over the lease, phone, etc. Roughly $20k in value/no further Colorado expense to the bank.
3. Do they want more than that, or are we on the right track? $5,000 in cash?

57. Sutterfield responded only with "Agreed!"

58. On September 25, 2023—as Sutterfield continued to negotiate her departure from MidWest*One* with Rosenthal working behind the scenes—Anderson also began sending information to Sutterfield's personal email address, including an LPL Financial termination request form.

11

59. On September 28, 2023, Mr. Evans emailed Sutterfield regarding the valuation of the block of business. Mr. Evans wrote that the book was worth $200,000-$250,000 "minimum," but attached LPL's estimated market value for the block of business with a low value of $426,193 and high value of $576,615.

60. Again, Sutterfield forwarded the email to Mr. Rosenthal.

61. Simultaneously, on September 28, 2023, Anderson sent three emails containing account information for a MidWest*One* client to Sutterfield's personal email address.

62. Upon information and belief, Anderson sent the three emails to Sutterfield's personal email so that she could use the MidWest*One* account information to compete against MidWest*One* at Elevate Wealth Management.

63. On October 3, 2023, Jennifer O'Shea, a MidWest*One* client, sent an email to Sutterfield and Anderson, stating: "Can you remind me of the name of the firm you are merging with? I wrote it down on a notebook that is at the office and I'm at home today."

64. This email clearly demonstrates that Sutterfield was soliciting MidWest*One* clients to follow her to Elevate Wealth Management while still employed by MidWest*One*.

65. On October 5, 2023, Anderson sent a blank email to Sutterfield attaching a spreadsheet entitled "Annuity Tracking Spreadsheet 2023." The spreadsheet includes information regarding 47 clients, including their contract numbers, account types, company, rider, policy value, holdings, surrender date, and notes.

66. Again, the attachments unquestionably contained Confidential or Trade Secret Information as defined by the Confidentiality and Non-Solicitation Agreement.

67. On October 6, 2023, Sutterfield sent her notice of resignation to Mr. Evans, stating only:

> Please accept my notice of resignation from MidWest*One* Bank. My resignation is effective immediately.
>
> Should any client inquire about my departure, pursuant to FINRA Regulatory Notice 19-10, and my consent hereby provided to MidWest*One* Bank allowing MidWest*One* Bank to share my contact information, MidWest*One* Bank is required to timely and clearly inform the clients I serviced at MidWest*One* Bank that I may be reached at the address and telephone number listed below.

68. Importantly, Sutterfield failed to negotiate a buyout of the book of business. Thus, she was still bound by both the Purchase and Sale Agreement and the Confidentiality and Non-Solicitation Agreement, which jointly prohibited her from inducing or attempting to induce any customer with whom she had significant contact to cease doing business with MidWest*One* or to in any way interfere with the relationship between MidWest*One* and its customers.

69. In the absence of an agreement to purchase her block of business, MidWest*One* refused to consent to Sutterfield joining another LPL branch, meaning Sutterfield would not be able to service her clients through LPL.

70. On November 10, 2023, Sutterfield's attorney wrote a letter addressed to LPL's attorney and copied MidWest*One*. Counsel repeatedly stressed that Sutterfield would abide by the terms of her restrictive covenants, stating:

> Ms. Sutterfield will attest to the fact that she did not, and will not, solicit clients or employees of MidWest*One*. She will further attest that, pursuant to the FINRA rules governing advisors; only after leaving MidWest*One*, did she advise her

13

> clients that she left MidWest*One* with the desire to transition into an independent channel with LPL. Ms. Sutterfield did not ask her clients to move with her to LPL. You should know, however, that the vast majority of Ms. Sutterfield's clients are family members or long-time friends, who will, of their own volition, move with her no matter what firm she aligns with. As you already know, the financial industry is a service industry wherein clients decide where they will go.
>
> Along those same lines, Ms. Sutterfield did not solicit former MidWest*One* employee, Ms. Anderson, to follow her to LPL. Ms. Anderson, upon learning of Ms. Sutterfield's decision to leave MidWest*One*, decided on her own accord to leave, as well.
>
> ***
>
> Ms. Sutterfield has no issue with adhering to the [Confidentiality and Non-Solicitation] Agreement's 12-month restriction not to solicit clients from MidWest*One* because she is not soliciting clients or employees from MidWest*One*. If anyone, including MidWest*One*, is asserting that Ms. Sutterfield is violating any of the terms of the [Confidentiality and Non-Solicitation] Agreement, they are grossly mistaken.

71. The very next day—on November 11, 2023—MidWest*One* customer Kirsten Bell notified MidWest*One* that Sutterfield had reached out to her and her father to notify them of her move to Elevate Wealth Management and that all accounts would still be serviced by Sutterfield at Elevate Wealth Management, thereby making clear that Sutterfield was soliciting MidWest*One* clients.

72. Finally, after her departure, MidWest*One* remained able to access the LPL portal and view the financial advisor for all clients who were serviced by Sutterfield during her employment with MidWest*One*.

14

73. As of Spring 2024, 72 of MidWest*One*'s former clients, with whom Sutterfield worked, are now working with Rosenthal at Elevate Wealth Management.

74. Included among these clients are Jennifer O'Shea, whom Sutterfield solicited for Elevate Wealth while employed by MidWest*One*, and Kirsten Bell, who confirmed that Sutterfield solicited her.

75. Upon information and belief, Sutterfield and Rosenthal conspired to have Rosenthal listed as the broker-dealer with LPL to allow Sutterfield to continue to service her accounts.

76. MidWest*One* has incurred significant financial harm as a result of Sutterfield, Anderson, Rosenthal, and Elevate Wealth Management pirating Sutterfield's block of business from MidWest*One*.

## COUNT ONE
## BREACH OF FIDUCIARY DUTY OF LOYALTY AGAINST ANDERSON

77. MidWest*One* restates and incorporates each preceding Paragraph as if fully set forth herein.

78. A duty of loyalty exists in every employment relationship.

79. As an employee of MidWest*One*, Anderson owed MidWest*One* a duty of loyalty.

80. Anderson breached her duty of loyalty to MidWest*One* by preparing to compete and ultimately competing with MidWest*One* at Elevate Wealth Management while Anderson was still employed by MidWest*One*.

81. Anderson breached her duty of loyalty to MidWest*One* by sending MidWest*One*'s Confidential and Trade Secret Information to Sutterfield's personal email account while Anderson was still employed by MidWest*One*.

82. Anderson breached her duty of loyalty to MidWest*One* by engaging in conduct to the detriment of MidWest*One*'s interests while still employed by MidWest*One*, including soliciting clients and misappropriating MidWest*One*'s Confidential and Trade Secret Information.

83. MidWest*One* has been damaged by Anderson's fiduciary breaches in an amount exceeding $75,000 and to be determined and proven at trial.

## COUNT TWO
## TORTIOUS INTERFERENCE WITH CONTRACT AGAINST ROSENTHAL AND ELEVATE WEALTH MANAGEMENT
**(The Purchase Sale Agreement and the Confidentiality and Non-Solicitation Agreement)**

84. MidWest*One* restates and incorporates each preceding Paragraph as if fully set forth herein.

85. Sutterfield and MidWest*One* had valid contracts with respect to the Purchase and Sale Agreement and the Confidentiality and Non-Solicitation Agreement.

86. Rosenthal was aware of the Purchase Sale Agreement and the Confidentiality and Non-Solicitation Agreement when he was negotiating with Sutterfield to join Elevate Wealth Management.

87. Alternatively, Rosenthal had knowledge of facts that should have lead him to inquiring about the existence of these contracts.

88. Rosenthal acted deliberately and without justification to interfere with MidWest*One*'s contracts with Sutterfield when he hired Sutterfield and encouraged her to solicit MidWest*One* employees and customers in breach of the Purchase Sale Agreement and the Confidentiality and Non-Solicitation Agreement. He further intentionally interfered with these contracts by advising Sutterfield in communications related to the sale of MidWest*One*'s block of business back to Sutterfield.

89. Rosenthal's improper influence and/or instruction caused Sutterfield to breach her obligations under the Purchase Sale Agreement and the Confidentiality and Non-Solicitation Agreement. Rosenthal's conduct and motive were clear: to obtain MidWest*One*'s clientele without paying for it and devising a way to avoid Sutterfield's restrictive covenants.

90. Rosenthal was acting within the scope of his employment with Elevate Wealth Management while recruiting Sutterfield to join Elevate Wealth Management, thereby binding Elevate Wealth Management to his misconduct.

91. As a direct result of Rosenthal and Elevate Wealth Management's tortious interference with contract with respect to the Confidentiality and Non-Solicitation Agreement, MidWest*One* has lost clients, has been thrust into litigation with Sutterfield and has suffered monetary damages in excess of $75,000 to be determined and proven at trial, together with all of MidWest*One*'s costs, disbursements and attorney's fees as provided under Colorado law.

**COUNT THREE**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**AGAINST ANDERSON, ROSENTHAL, AND**

## ELEVATE WEALTH MANAGEMENT

92. MidWest*One* restates and incorporates each preceding Paragraph as if fully set forth herein.

93. Rosenthal and Elevate Wealth Management assisted in Sutterfield breaching her duty of loyalty to MidWest*One* while she was employed with MidWest*One* by encouraging her to solicit Anderson to follow her to Elevate Wealth Management and ultimately offering Anderson employment.

94. Anderson, Rosenthal, and Elevate Wealth Management assisted in Sutterfield breaching her duty of loyalty to MidWest*One* while she was employed with MidWest*One* by encouraging her to prepare to compete with MidWest*One* and, in certain cases, competing with MidWest*One* in soliciting MidWest*One* clients to follow her to Elevate Wealth Management.

95. Anderson, Rosenthal, and Elevate Wealth Management assisted in Sutterfield breaching her duty of loyalty to MidWest*One* by encouraging her to misappropriate MidWest*One* Confidential and Trade Secret Information while employed by MidWest*One*.

96. Anderson, Rosenthal, and Elevate Wealth Management knew that these actions were tortious and would violate Sutterfield's Purchase and Sale Agreement and Confidentiality and Non-Solicitation Agreement, but nonetheless actively participated in and assisted in Sutterfield's breach of fiduciary duties.

97. Anderson, Rosenthal, and Elevate Wealth Management's assistance with Sutterfield's breach of fiduciary duties was substantial.

98. MidWest*One* has been damaged by Anderson, Rosenthal, and Elevate Wealth Management's assistance with Sutterfield's fiduciary breaches in an amount exceeding $75,000 and to be determined and proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, based upon the allegations stated in the foregoing paragraphs, Plaintiff MidWest*One* Bank ("Plaintiff") respectfully requests that this Court issue an Order as follows:

a. Entering judgment against all Defendants on a joint and several basis and in favor of Plaintiff in the amount of at least $75,000, with the exact amount of actual damages to be determined at trial;

b. Enjoining Anderson, Rosenthal, and Elevate Wealth Management from further encouraging, facilitating, or failing to prevent further breaches of the Purchase Sale Agreement and the Confidentiality and Non-Solicitation Agreement by Sutterfield;

c. Awarding Plaintiff all costs incurred by way of this action, including but not limited to filing fee costs, costs of service, court reporter costs, jury filing fees, and reasonable attorney's fees, including attorney fees incurred in the investigation of the claims presented in this lawsuit; and

    d.    For such other relief as the Court deems just and equitable.

**BASSFORD REMELE**
*A Professional Association*

Date: February 7, 2025

By: */s/ Nicholas J. Prola*
Nicholas J. Prola (IL #6302785)
100 South 5th Street, Suite 1500
Minneapolis, MN 55402-1254
Telephone:    (612) 333-3000
Facsimile:    (612) 333-8829
Email:    nprola@bassford.com

*Attorneys for Plaintiff MidWestOne Bank*